IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| MARTIN V. KLOTZ, | : | CIVIL ACTION |
| on behalf of himself and | : | |
| others similarly situated | : | |
| | : | |
| v. | : | |
| | : | |
| TRANS UNION, LLC, et al. | : | NO. 05-4580 |


MEMORANDUM AND ORDER

McLaughlin, J.                                    July 2, 2007


        The defendant, a credit reporting agency ("CRA"),
provided the plaintiff a copy of his credit report.  After the
plaintiff submitted documents prepared by a third party disputing
certain items in the report, the defendant sent him form letters
declining to investigate whether the disputed items were
accurate.  The plaintiff alleges that the defendant's failure to
investigate and its sending of the form letters violated the Fair
Credit Reporting Act ("FCRA"), and he seeks to bring a class
action on behalf of all individuals who received either of two
form letters denying a request to investigate negative credit
information.  Before the Court is the plaintiff's motion for
class certification.  The Court will deny the motion.


I.  Facts

    A.  The Plaintiff's Disputes

        In April of 2003, the plaintiff received a copy of his

credit report from the defendant.  In 2003 and 2004, he submitted
to the defendant forms prepared by a company called NCER that
challenged whether the negative information in his credit file
was accurate.  NCER is a credit repair organization ("CRO"), an
entity that is paid by a consumer to help clear up the consumer's
credit report.  The disputes prepared by NCER contested fourteen
items in the plaintiff's file.  Defs.' Br. in Opp. Ex. C.

Disputes sent in June and August of 2003 claimed that
most of the derogatory information in the plaintiff's credit
report pertained to accounts that were paid in full before they
went to collection.  Id.  Disputes sent in February of 2004,
meanwhile, stated that eight of these same accounts were not his.
Id.

At his deposition, the plaintiff was asked about this
apparent inconsistency and his role in forming the specific
objections contained in the disputes.  "NCER prepared this," he
responded.  "I just took them, signed them, and sent them...[a]nd
that goes for all of them."  Klotz Dep. at 164:5-10.[1]  Similarly,
he testified, "I was just told to sign it and send it...I didn't
question what was what," adding that he did not check any of the
disputes for accuracy.  Id. at 161:1-17.  He further testified:
"At the time, when this was written, honestly, I didn't pay

---

[1]    A portion of Mr. Klotz's deposition is attached to the
Defendant's Brief in Opposition as Exhibit F and cited herein as
"Klotz Dep. at __."

enough attention to it...I just signed it, and sent it." Id. at 166:22-25.

The defendant sent the plaintiff three letters in response to his disputes.  The first, received in June of 2003, stated:

> We received a dispute regarding your credit report from a credit repair agency.  Our experience shows that credit repair agencies routinely and knowingly dispute accurate information.  For this reason, we will not take action on the dispute submitted from the credit repair agency.

Am. Compl. Ex. A.[2]

In August of 2003 and February of 2004, the plaintiff received a second and third letter from the defendant regarding his disputes.  The letters were identical, stating:

> We recently received a dispute regarding your credit report from a third party that we believe operates as a credit repair organization.  According to the Federal Trade Commission, credit reporting agencies are not required to process disputes submitted by third parties.  In addition, our experience shows that many credit repair organizations dispute accurate information or submit irrelevant disputes.  We have reasonably determined that the dispute submitted on your behalf was frivolous or irrelevant.

Id.[3]  All three letters sent by the defendant informed the

---

[2]    Because of the FCRA's two-year statute of limitations and this suit's August 2005 filing date, the June 2003 letter is not part of the plaintiff's case.

[3]    The plaintiff alleges that he sent an additional dispute in December of 2003.  Neither this dispute letter nor any response from the defendant has been provided by the parties. The plaintiff does not suggest that the December dispute or the

plaintiff of his right to reinvestigation if he submitted a dispute directly and stated that the defendant does not accept disputes from third parties unless they are accompanied by a notarized power of attorney that (1) authorizes an attorney or family member to represent the consumer or (2) is irrevocable and unlimited.

The three letters were accompanied by forms that the plaintiff could fill out and return if he wished to pursue the disputes of particular items.

B.   The Origin of the Letters Sent to the Plaintiff

Prior to 2002, the defendant maintained a policy of not responding to requests for reinvestigation made by third parties. The defendant's Rule 30(b)(6) witness, Eileen Little, testified that in June of 2002, the defendant decided to apply this policy to disputes sent from CROs.  Little Dep. at 53.[4]  It drafted form letters, called 345 letters, to respond to such disputes.  Id. The three letters sent to the plaintiff were 345 letters. According to Ms. Little, the decision to send 345 letters in response to disputes sent by any CRO was motivated primarily by

letter he received in response differed materially from the other correspondence between the parties.

[4]     A copy of Ms. Little's deposition is attached to the Plaintiff's Brief in Support as Exhibit 2 and cited herein as "Little Dep. at ___."

an increased number of disputes from NCER and a government
investigation into NCER's business practices.  Id.[5]

The defendant employed investigators to determine
whether a 345 letter should be sent in response to a dispute.
Id. at 108.  Because disputes are frequently mailed en masse by
CROs, they often bear certain hallmarks.  The defendant's
investigators therefore examined each dispute's postage,
envelope, and return address to determine whether it was sent by
a CRO.  Id. at 70-71.  Other factors that the investigators
considered were whether disputes were sent in identical formats
and whether the consumer's letter was a successive dispute of all
of the derogatory information in his or her credit file.  Id. at
72-73.

According to the defendant, NCER no longer mails
disputes to CRAs.  Instead, NCER now sends disputes to its
clients with a cover letter instructing them to review, sign and
send the disputes to the CRA.  Klotz's disputes were sent in this
manner.[6]  The defendant is able to detect NCER's involvement in

---

[5]     Trans Union was served a subpoena in May of 2001
relating to a criminal investigation of NCER's principals for
fraudulently promising NCER clients that it could clear up their
credit history.  This lead to a civil action against NCER by the
FTC in 2003 and a criminal action against NCER's principals in
2004.

[6]     Klotz did not review the disputes drafted by NCER:
"[NCER] said look it over, but I didn't know what I was looking
over or what to compare it to."  Klotz Dep. at 172:2-3.

these cases, it claims, because the consumers often include the cover letter from the CRO in the package they mail to the CRA, as Klotz did.

Certain consumers responded to the 345 letter with powers of attorney that purported to authorize third parties to submit disputes on their behalf.  Finding that the powers of attorney were incomplete, the defendant drafted a form called the 346 letter in October of 2003.  The letter explained that the defendant would only accept a dispute from a CRO if the power of attorney was complete and irrevocable.


C.   The Legal Background

The FCRA confers on a consumer a right to have the negative information on his or her credit report investigated for accuracy, providing:

> If the completeness or accuracy of any item of
> information contained in a consumer's file at a
> consumer reporting agency is disputed by the consumer
> and the consumer notifies the agency directly of such
> dispute, the agency shall reinvestigate free of charge
> and record the current status of the disputed
> information, or delete the item from the file....before
> the end of the 30-day period beginning on the date on
> which the agency receives notice of the dispute from
> the consumer.

15 U.S.C. § 1681i(a)(1)(A).  When a CRA receives a dispute in conformity with (a)(1)(A), it must provide notice of the dispute to the entity that provided the disputed information.  Id. § 1681(a)(2).

6

A CRA need not reinvestigate every dispute, however. An agency can terminate a reinvestigation if it "reasonably determines that the dispute by the consumer is frivolous or irrelevant." Id. 1681i(a)(3)(A).  If an agency terminates the reinvestigation, it must inform the consumer of the reasons for the decision.  Id. § 1681i(a)(3)(B), (C).

II.  Claims

The plaintiff's amended complaint asserts two claims. The first, alleging a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection law, is not relevant to the present motion.

The second claim alleges that the defendant failed to reinvestigate as required by (a)(1)(A); failed to notify the provider of the disputed information as required by (a)(2); and failed to give reasons for the determination of frivolousness or irrelevance as required by (a)(3)(C).

The plaintiff claims that these violations were willful and thus sues under section 1681n, which authorizes a plaintiff to seek actual damages or statutory damages, in addition to punitive damages, for willful violations of the FCRA.

The plaintiff seeks to pursue his FCRA claims as a class action seeking statutory damages.  He proposes a class of all consumers who received 345 or 346 letters from August 29,

2003 to the present (to recover for all alleged violations within the FCRA's two-year statute of limitations period).

## III.  Analysis

The Court will first examine the components of a section 1681i claim and then consider whether the plaintiff's proposed class satisfies the requirements of Rule 23.  The Court concludes that the plaintiff has failed to establish several of the prerequisites to class certification.

### A.  Section 1681i

To succeed on a section 1681i claim, a plaintiff must show (1) that he disputed the accuracy of an item in his or her credit file and (2) that a reasonable investigation by the agency could have uncovered the inaccuracy.  Cushman v. Trans Union Corp., 115 F.3d 220, 226 (3d Cir. 1997).  A defendant can escape liability if it can demonstrate that it terminated a reinvestigation upon a reasonable conclusion that the dispute was frivolous or irrelevant.  15 U.S.C. § 1681i(a)(C)(3).

#### 1.  Did the Consumer Invoke the Right to Reinvestigation?

Before they can recover on claims under section 1681i(a), consumers must show that they invoked their right to reinvestigation.  The statute requires a CRA to investigate a

8

disputed item only if the dispute is conveyed "directly" by the consumer.

The FCRA charges the FTC with the FCRA's enforcement and authorizes the agency to issue procedural rules to assure compliance with its provisions.  The FTC has issued non-binding commentary that lack the force of law but reveal the agency's interpretation of various provisions of the FCRA, including "directly": "[An agency] is not required to respond to a dispute of information that the consumer merely conveys to others (e.g., to a source of information)."  16 C.F.R. Pt. 600, Sec. 611 ¶ 7. The commentary further provides that a CRA "need not reinvestigate a dispute about a consumer's file raised by any third party, because the obligation under the section arises only when 'an item of information in his file is disputed by the consumer.'" Id. ¶ 8.

If the dispute is not conveyed to the CRA "directly," a claim under section 1681i will fail.  A claim based on (a)(1)(requiring a CRA to reinvestigate and verify or remove a disputed item within 30 days); (a)(2)(requiring a CRA to notify the provider of the disputed item); or (a)(3)(prescribing the form of notice to be sent to a consumer upon a determination that his dispute is frivolous or irrelevant) all presuppose that the consumer has satisfied the precondition in (a)(1)(A).

2.   <u>Was the Item Inaccurate?</u>

A claim under 1681i will also fail if the consumer cannot show that the information in his or her file was inaccurate.  <u>Cushman</u>, 115 F.3d at 226-27.  In <u>Cushman</u>, the United States Court of Appeals for the Third Circuit reinstated the plaintiff's section 1681i claim after she had submitted evidence of, among other things, the inaccuracy of certain information in her file, her notification to the defendant of the inaccuracy, and the damages resulting from the defendant's failure reasonably to reinvestigate.  <u>Id.</u>

The Court quoted approvingly the district court's statement that the decisive inquiry under section 1681i is whether a defendant could have determined that a plaintiff's account contained inaccurate information if it had conducted a reasonable investigation.  <u>Id.</u> at 226.  This standard requires that a plaintiff show that the disputed information was inaccurate.  If the information in a consumer's file was, in fact, correct, then no investigation could have revealed the existence of inaccurate information because there was no inaccurate information to uncover.

District courts within the Third Circuit have recognized this, reading <u>Cushman</u> as requiring that a plaintiff pursuing a section 1681i claim show that the information in his or her file was inaccurate.  See <u>Crane v. Trans Union Corp.</u>, 282

F.Supp.2d 311, 321 (E.D. Pa. 2003)(holding that the plaintiff had raised a dispute of material fact about the accuracy of the information); O'Connor v. Trans Union Corp., 1999 WL 773504 at *6 (E.D. Pa. 1999) (stating that the plaintiff had shown that the defendant failed to delete "erroneous" credit information from his file).[7]

Other courts agree, explicitly holding that a plaintiff must prove the inaccuracy of the disputed item in order to recover under section 1681i.  See, e.g., Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir. 1991); Benson v. Trans Union, LLC, 387 F.Supp.2d 834, 842 (N.D. Ill. 2005); Moline v. Experian Info. Solutions, Inc., 289 F.Supp.2d 956, 958-59 (N.D. Ill. 2004); Molton v. Experian Info. Solutions, Inc., 2004 WL 161494 at *6 (N.D. Ill. 2004); Murphy v. Midland Credit Management, Inc., 456 F.Supp.2d 1082, 1091 (E.D. Mo. 2006); Lenox v. Equifax Info. Services, LLC, 2007 WL 1406914 at *4 (D. Or. 2007);  Zala v. Trans Union LLC, 2001 WL 210693 at *5 (N.D. Tex. 2001)(finding that the plaintiff had produced sufficient evidence

---

[7]     The plaintiff cites O'Connor as holding that a plaintiff suing under section 1681i need only show that he disputed an item in his file and that the reinvestigation did not resolve the dispute.  P's Br. in Supp. at 7.  These, however, are the requirements for claims under sections 1681(b) and (c), provisions which apply "if the reinvestigation does not resolve the dispute."  15 U.S.C. 1681i(b).  The plaintiff, in contrast, sues under section 1681i(a) and alleges not that the defendant failed to fulfill its post-reinvestigation obligations but that "no reasonable reinvestigation has taken place."  Cushman, 115 F.3d at 223-24.

of inaccuracy to avoid summary judgment); <u>Elliot v. TRW, Inc.</u>, 889 F.Supp. 960 (N.D. Tex. 1995).

   The plaintiff disputes that accuracy is relevant to a section 1681i claim, arguing that the section invests a consumer with a procedural right to reinvestigation in contrast with the substantive protections of section 1681e(b), which requires that an agency employ reasonable procedures to ensure the accuracy of items on credit reports.

   <u>Cushman</u>'s analysis of sections 1681i and 1681e(b) undercuts this assertion.  The <u>Cushman</u> Court held that section 1681i, like section 1681e(b), requires that an agency perform a "reasonable" investigation.  115 F.3d 223-24.  The primary difference between the provisions, the Court observed, is the nature of the investigation required by each section.  Where section 1681e(b) requires that a CRA reasonably investigate any derogatory information placed in a consumer's credit file, a "reinvestigation" under section 1681i occurs after the consumer raises a specific complaint about an item.  Consequently, an agency must do more than rest on its section 1681e(b) procedures when responding to a consumer's request to reinvestigate under section 1681i.  <u>Id.</u>

   In so holding, the Court suggested that sections 1681i and 1681e(b) provide similar protections, in contrast to the procedural/substantive dichotomy asserted by the plaintiff.

Given this relationship between the two sections, the fact that a section 1681e(b) claim requires inaccuracy further supports the existence of an inaccuracy requirement for a claim under section 1681i.  See Philbin v. Trans Union Corp., 101 F.3d 957, 963 (3d Cir. 1996).

The plaintiff finds support for his contention that accuracy is irrelevant to a section 1681i claim in Morris v. Trans Union, LLC, 420 F.Supp.2d 733 (S.D. Tex. 2006).  Morris, however, held only that inaccuracy was a defense to a section 1681i claim and not an element of a prima facie case.  Id. at 751-52 & n.88.[8]

---

[8]    Morris does suggest an argument for the plaintiff's position, although he has not asserted it.  Arguably, the inaccuracy requirement stems from the fact that a plaintiff claiming negligent violations of section 1681i must show "actual damages."  15 U.S.C. § 1681o.  One could posit that a plaintiff cannot show actual damages if the disputed information was accurate.  In contrast, the inaccuracy of the disputed information might seem irrelevant to a claim for a willful violation of section 1681i, which does not require a plaintiff to prove actual damages.

Cushman rebuts this argument.  The Cushman Court listed the evidence offered by the plaintiff, which it held was sufficient to withstand a directed verdict: "evidence . . . concerning the inaccuracy of the information, Cushman's notification to [the defendant] of the inaccuracy and the underlying fraud, the nature of [the defendant's] reinvestigation and the costs incurred by it...and the damages suffered by Cushman."  Cushman thus viewed evidence of inaccuracy as distinct from evidence of actual damages.  Cushman's suggestion that a plaintiff alleging a negligent violation of section 1681i must show both inaccuracy and actual damages implies that "actual damages" is a requirement independent of the inaccuracy requirement, not its source.

### 3. Was the Dispute Frivolous or Irrelevant?

A claim based on the right to reinvestigation under sections (a)(1) or (a)(2) will also fail if the defendant can show that it reasonably concluded that a dispute was frivolous or irrelevant. 15 U.S.C. 1681i(a)(3)(A).

The FTC commentary gives guidance to a CRA in determining when a dispute is frivolous or irrelevant:

> A [CRA] must assume a consumer's dispute is bona fide, unless there is evidence to the contrary. Such evidence may constitute receipt of letters from consumers disputing all information in their files without providing any allegations concerning the specific items in the files, or of several letters in similar format that indicate that a particular third party (e.g., a "credit repair" operator) is counselling [sic] consumers to dispute all items in their files, regardless of whether the information is known to be accurate.

16 C.F.R. Pt. 600, Sec. 611 ¶ 11. Individuals who send frivolous or irrelevant disputes are still covered by section (a)(3)(B) and (C), which provide procedures through which a CRA must notify a consumer of the determination that his dispute was frivolous or irrelevant. An (a)(3) claim will fail, however, if the consumer fails to satisfy the precondition in (a)(1)(A).

---

Further, section 1681o could not be the source of the inaccuracy requirement if section 1681i confers a procedural right, as the plaintiff asserts. Under the FCRA, "actual damages" can take the form of emotional damages. See Philbin v. Trans Union Corp., 101 F.3d 957, 963 n.3 (3d Cir. 1996). Emotional damages resulting from the denial of a procedural right to have credit information reinvestigated would not presuppose that the disputed information was inaccurate.

Having outlined the contours of section 1681i claims, the Court will now consider whether the plaintiff's proposed class satisfies the requirements of Rule 23.

B. <u>Rule 23</u>

In order to proceed as a class action, the plaintiff must show that the proposed class meets the following requirements: the class is so numerous that joinder of all members is impracticable ("numerosity"); there are questions of law or fact common to the class ("commonality"); the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and the representative parties will be fairly and adequately protect the interests of the class ("adequacy").  Fed. R. Civ. Proc. 23.

The plaintiff seeks to proceed as a (b)(3) class and therefore must show, in addition to the requirements above, that common questions of law and fact predominate over questions affecting individual members ("predominance") and that a class action is superior to other available methods for fair and efficient adjudication of the controversy ("superiority").

1. <u>Numerosity</u>

The defendant concedes that the numerosity requirement is met.  The parties have stipulated that the defendant sent more

than 100,000 345 and 346 letters.  Assuming that a class could proceed that included consumers who received 345 or 346 letters in response to disputes mailed either by the consumer or a CRO, the Court agrees that the numerosity requirement is met.  See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)(stating that generally, if the number of potential plaintiffs exceeds 40, the numerosity requirement is met).

### 2.  Commonality

The proposed class also meets the commonality requirement.  The plaintiff alleges that the 345 letter failed to give a reason for the defendant's determination that the consumer's dispute was frivolous or irrelevant as required by 1681i(a)(3)(C)(i).  Because the putative class members received identical 345 letters, the conformity of the letter with section (a)(3)(C)(i) can be determined on a class-wide basis.

### 3.  Typicality

Typicality requires that the claims or defenses of the representative parties are typical of the claims or defenses of the class.  Georgine v. Amchem Products, Inc., 83 F.3d 610, 631 (3d Cir. 1996).  The requirement prevents a situation where the legal theories of the named plaintiffs potentially conflict with those of the absent class members.  Id.  The inquiry also

assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented.   Id.

The plaintiff fails this requirement because he is not typical of the class in three ways.  First, he never received the 346 letter and therefore his claims are not typical of the class members who did.  Second, he stands on different footing than the majority of the class in establishing that his disputes were sent "directly," a prerequisite for claims under section 1681i(a).  Third, the "frivolous or irrelevant" defense will be easier to prove in the plaintiff's case than in the case of the absent class members.

To prevail on a section 1681i claim, each member must prove that disputes were sent "directly."  The plaintiff mailed his disputes himself, while the majority of 345 letters were sent in response to mailings from a CRO.[9]  The majority of the putative class members must therefore establish that "directly" applies to a factual scenario that is distinct from the plaintiff's case.  The plaintiff must show that disputes prepared by a third party but sent by the consumer fall within the statute's definition of "directly."  The class members, meanwhile, must argue for a definition of "directly" that

---

[9]     At oral argument, the defendant stated that 345 letters were "overwhelmingly" sent in response to disputes mailed by CROs.  Tr. at 19.

encompasses disputes mailed by third parties.  The class members
cannot rely on the plaintiff to propose and prove a definition of
"directly" that does not apply to his case, and therefore he has
not established that he can fairly represent their interests.

        The atypicality of the plaintiff's disputes also leaves
him more vulnerable than the other class members to the defense
that Trans Union reasonably concluded that the disputes were
frivolous or irrelevant.  The defendant began sending 345 letters
to CROs in response to an increased volume of disputes from NCER
and federal investigations into NCER's practices.  This change in
policy reflected a judgment that disputes sent by CROs were
frivolous or irrelevant because of specific problems with NCER.
The defendant has a colorable argument that the application of
this policy to NCER was justified because of its knowledge of the
possibility that NCER was systematically disputing accurate
information on behalf of its clients.  Allowing the plaintiff to
represent the class could prejudice the class members who did not
employ NCER.[10]

        Even if it were impermissible for the defendant to
conclude that all disputes that originated from NCER were

---

        [10]    For the class members who were not clients of NCER, the
reasonableness of the defendant's determination that their
disputes were frivolous presents a compound issue.  In their
cases, the question will be whether, if it was reasonable to
conclude that disputes sent by NCER were frivolous or irrelevant,
it was reasonable to further conclude that other CROs were
engaging in practices similar to NCER.

frivolous or irrelevant, the defendant can still argue that its determination that the plaintiff's disputes were frivolous or irrelevant was reasonable.  The plaintiff, in addition to disputing all of his negative information multiple times, submitted contradictory disputes, first alleging that he had paid off certain accounts and then maintaining that the accounts were not his.  Because of the possibility that these circumstances could support Trans Union's determination that the disputes were frivolous, he fails the typicality requirement.[11]

### 4.  Adequacy

The adequacy inquiry has two focuses.  The first is whether counsel is qualified to represent the class.  In re Warfarin Sodium Antitrust Litigation, 391 F.3d 51 (3d Cir. 2004).  The defendant concedes, and the Court is satisfied, that plaintiff's counsel is adequate.

The second question is whether there are conflicts of interest between the named plaintiff and the class he seeks to represent.  Id.  Class members cannot be adequately represented by a named plaintiff with divergent interests.  In re Diet Drugs,

---

[11]     Such a conclusion does not, contrary to the plaintiff's assertion, allow the defendant to invent a post-hoc justification for the sending of the 345 letters.  Instead, the reasonableness of the frivolous determination turns on the factors that its investigators weighed in considering whether to send 345 letters, including the form and substance of the disputes.

385 F.3d 386, 395 (3d Cir. 2004).

The plaintiff is an inadequate class representative for the same reasons that he is atypical: he has not shown that he can fairly represent those who received a 346 letter, those whose disputes were mailed from CROs, or those whose disputes bore fewer indicia of frivolousness.

5.  <u>Predominance</u>

The plaintiff has also failed to show that common issues predominate over individual ones.  The success of the class members' claims will depend on several issues that must be determined individually: (1) whether a dispute was sent "directly"; (2) for claims under (a)(1) and (a)(2), whether the disputed information was inaccurate; and (3) for claims under (a)(1) and (a)(2), whether Trans Union reasonably concluded that the disputes were frivolous or irrelevant.

Balanced against this series of individual issues is one common question: whether the 345 letter comports with the requirements of (a)(3)(C).  This question, however, is subordinate to the individual question of whether the disputes were sent "directly."  Determining the defendant's liability on any of the class members' claims therefore requires a case-by-case assessment.

This case is therefore akin to <u>Pendleton v. Trans Union</u>

20

Systems, 76 F.R.D. 192 (E.D. Pa. 1977), where the court refused to certify a class under section 1681e(b).   The court noted that where individual factual determinations enter into proving the defendant's liability, classes are rarely certified.   Id. at 195. As in this case, the question of whether each proposed class member could prevail on his or her claims required an individual determination.   Id.; see also Harper v. Trans Union, LLC, 2006 WL 3762035 at *8 (E.D. Pa. 2006)(refusing to certify a class based on violations of section 1681e(b), reasoning that the "plaintiff's claim may be typical of the absent class members in that all claims arise from the same conduct, but due to the highly individualized proofs required I find that common questions do not predominate").

The plaintiff contends that the requirement of a "direct" dispute does not present an individual issue, arguing that when a consumer seeks the help of a third party in disputing items on a credit report and authorizes the third party to send disputes on his or her behalf, the statute's definition of "directly" is satisfied.

Even if the Court were to adopt the plaintiff's definition, he has not shown that whether the disputes were sent "directly" by the consumer does not present individual issues. The fact that a consumer received a 345 letter indicates only that the defendant believed that the request originated from a

CRO.  Whether consumers were merely "assisted" by third parties
who were authorized to send particular disputes on their behalf,
as the plaintiff alleges, cannot be determined from the fact that
the defendant sent 345 letters to the consumers.[12]

The plaintiff also argues that whether the defendant
reasonably determined that a dispute was "frivolous or
irrelevant" does not present an individual issue.  Despite the
plaintiff's contentions, however, the decision to send 345
letters was not mechanical.  Instead, the decision was made after
an examination of each dispute's envelope and its form.

The defendant often used a dispute's origination from a
CRO as a proxy for its frivolousness or irrelevance.  If the use
of this proxy was justified, the reasonableness of the
defendant's termination of the reinvestigation will turn on an
individual issue: whether a particular dispute contained
hallmarks sufficient to identify its origination from a CRO.

Even if the use of the proxy was not justified, the

---

[12]    The main case cited by the plaintiff underscores that a
determination of whether a dispute was sent "directly" must be
determined on a case-by-case basis.  In Milbauer v. TRW, Inc.,
707 F.Supp.92 (E.D.N.Y. 1989), a case which predates the FTC
commentary, the court held that a credit reporting agency could
not neglect to answer a dispute merely because it was
communicated through a third party (in that case, the plaintiff's
lawyer).  The Court found that "it would be unfair, under
circumstances like those present here, to deprive an individual
of the assistance he may need by banning all third parties from
communicating, on the consumer's behalf, directly with the
consumer reporting agency."  Id. at 95 (emphasis added).

Court must still consider individual issues.  Ms. Little testified that in certain cases, the evidence of frivolousness or irrelevance was direct, as when the consumer disputed all of the information in his or her file, or when the consumer submitted successive disputes.  In these cases, the defendant need not have relied on a dispute's origination from a CRO as a proxy for its frivolousness.  Whether the determination that the dispute was frivolous or irrelevant was supported by these features must be determined on an individual basis.

        6.  <u>Superiority</u>

        The plaintiff has also failed to show that a class action is the superior method of adjudicating the controversy.  The plaintiff argues that a class action is effectively the only method of adjudication because the FCRA's limit on statutory damages would inhibit an individual plaintiff from bringing suit.  But the FCRA requires that a court award a successful plaintiff attorneys' fees, and punitive damages are available for violations of the FCRA that were willful, as the plaintiff alleges here.  <u>See</u> 15 U.S.C. § 1681n.  These financial incentives might not encourage each putative class member to bring suit, but they dispel the notion that a class action is the only way to adjudicate the lawfulness of the defendant's practices.

        Further, the lack of predominance supports the

conclusion that proceeding as a class action is not a superior method of adjudicating the controversy.  See, e.g., Barabin v. Aramark Corp., 210 F.R.D. 152, 162 n.4 (E.D. Pa. 2002); Kline v. Security Guards, Inc., 196 F.R.D. 261, 274-74 (E.D. Pa. 2000). The potential efficiencies of a class action are not realized where an individual assessment of each putative class member's claims must be made.  The plaintiff's proposed class presents such a situation.  Because he has failed to show typicality, adequacy, predominance, and superiority, his motion for class certification must be denied.

An appropriate order follows.

24

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MARTIN V. KLOTZ,                    :    CIVIL ACTION
on behalf of himself and           :
others similarly situated          :
                                   :
               v.                  :
                                   :
TRANS UNION, LLC, et al.           :    NO. 05-4580


ORDER

AND NOW, this 2nd day of July, 2007, upon consideration of the plaintiff's motion for class certification (Docket No. 53) and all briefs in support and opposition, and after oral argument heard on the motion on May 10, 2007, IT IS HEREBY ORDERED that for the reasons stated in the accompanying memorandum, the motion is denied.




BY THE COURT:



/s/ Mary A. McLaughlin
Mary A. McLaughlin, J.