

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARTIN V. KLOTZ,                :      CIVIL ACTION
on behalf of himself and       :
others similarly situated      :
                               :
                v.             :
                               :
TRANS UNION, LLC, et al.       :      NO. 05-4580

FILED

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

MEMORANDUM AND ORDER

McLaughlin, J.                              July 16, 2008

        The defendant, a credit reporting agency ("CRA"),

provided the plaintiff a copy of his credit report.  After the

plaintiff sent documents prepared by a third-party credit repair

organization ("CRO") disputing certain items in the report, the

defendant sent him form letters declining to investigate whether

the disputed items were accurate.  The plaintiff alleges that the

defendant's failure to investigate is a willful violation of the

Fair Credit Reporting Act ("FCRA").[1]

        The defendant has filed a motion for summary judgment

arguing, among other things, that the disputes were not "by" the

plaintiff, as required by the statute, but rather by the CRO:

the CRO prepared the disputes and the plaintiff's only role was

---

[1]      The plaintiff filed a motion for class certification on
May 30, 2006, which the Court denied on July 7, 2007.  The
plaintiff appealed the denial of class certification to the
United States Court of Appeals for the Third Circuit, which
denied the plaintiff's petition to appeal on August 24, 2007.

to sign the disputes and send them to the defendant.  The Court agrees and will grant summary judgment on this ground.

The plaintiff also has filed a motion for relief under Fed. R. Civ. P. 56(f), requesting further discovery.  The Court concludes that further discovery would not preclude summary judgment on the narrow ground that the disputes were not "by" the plaintiff, so the Court will deny the 56(f) motion.

I.  Facts

The Court views the record in the light most favorable to the non-moving party.[2]  The following facts are undisputed.

A.   The Plaintiff's Disputes

In April of 2003, the plaintiff received a copy of his credit report from the defendant.  In 2003 and 2004, he submitted to the defendant forms prepared by a company called National Credit Education & Review ("NCER") that challenged whether the negative information in his credit file was accurate.  NCER is a credit repair organization ("CRO"), an entity that is paid by a

---

[2]     On a motion for summary judgment, a court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is proper if the pleadings and other evidence on the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

consumer to help clear up the consumer's credit report.  The
disputes prepared by NCER contested fourteen items in the
plaintiff's file, all of the derogatory information on his credit
report.  Defs.' Br. Ex. A; Ex. B.

The June 2003 dispute package included a cover letter
with NCER's letterhead that said:  "STOP:  This is a dispute
letter created by NCER that you should mail to TransUnion.  Do
not send this letter to NCER."  The cover letter included "steps
to mail your dispute form," the first of which was "Remove cover
sheet and explanation from packet."  The instructions then said
that if no changes were necessary, the consumer should sign the
dispute letter, place it in the envelope with the address and
social security number verification, and mail the packet directly
to TransUnion.  The disputed information was presented in a
"boxed-in" format, with each piece of adverse information in a
box on the left side of the page and the reason for the dispute
in a box on the right side of the page.  Def.'s Br. Ex. B-1.

The August, 2003, dispute did not include the cover
letter but was in the same boxed-in format as the June dispute,
and contested exactly the same information for the same reasons.
The June and August disputes claimed that most of the derogatory
information in the plaintiff's credit report pertained to
accounts that were paid in full before they went to collection.
Def.'s Br. Ex. B-1, B-2.

3

The February, 2004, dispute included the same NCER cover letter as the June, 2003, dispute, and the disputes were in the same boxed-in format.  The February, 2004, dispute lists the same fourteen items as the previous disputes, but claims that nine of the accounts are not the plaintiff's accounts.  There is no claim that any of the accounts were paid in full before they went to collection.  Def.'s Br. Ex. B-3.

At his deposition, the plaintiff was asked about these inconsistencies and his role in forming the specific objections contained in the disputes.  "NCER prepared this," he responded.  "I just took them, signed them, and sent them . . . [a]nd that goes for all of them."  Klotz Dep. at 164:5-10.[3]  Similarly, he testified, "I was just told to sign it and send it . . . I didn't question what was what," adding that he did not check any of the disputes for accuracy.  Id. at 161:1-17.  He further testified:  "At the time, when this was written, honestly, I didn't pay enough attention to it. . . . I just signed it, and sent it."  Id. at 166:22-25.

The defendant sent the plaintiff four letters in response to his disputes.  The first, sent in June of 2003, stated:

---

[3]     A portion of Mr. Klotz's deposition is attached to the defendant's Brief in Support of its Motion for Summary Judgment as Exhibit C and is cited herein as "Klotz Dep. at ___."

> We received a dispute regarding your credit report
> from a credit repair agency.  Our experience shows
> that credit repair agencies routinely and
> knowingly dispute accurate information.  For this
> reason, we will not take action on the dispute
> submitted from the credit repair agency.

Am. Compl. Ex. A.[4]

In August of 2003, December of 2003, and February of 2004, the plaintiff received three more letters from the defendant regarding his disputes.  The letters were identical, stating:

> We recently received a dispute regarding your
> credit report from a third party that we believe
> operates as a credit repair organization.
> According to the Federal Trade Commission, credit
> reporting agencies are not required to process
> disputes submitted by third parties.  In addition,
> our experience shows that many credit repair
> organizations dispute accurate information or
> submit irrelevant disputes.  We have reasonably
> determined that the dispute submitted on your
> behalf was frivolous or irrelevant.

Id.; Def.'s Br. Ex. A-1, A-2, A-3, A-4.  All four letters sent by the defendant informed the plaintiff of his right to reinvestigation if he submitted a dispute directly and stated that the defendant did not accept disputes from third parties unless they were accompanied by a notarized power of attorney that (1) authorized an attorney or family member to represent the consumer or (2) was irrevocable and unlimited.

---

[4]     Because of the FCRA's two-year statute of limitations and this suit's August 2005 filing date, the June 2003 letter is not part of the plaintiff's case.

The defendant included in all of its 345 letters a
"Request for Investigation" form that promised to complete a
reinvestigation of disputed information within 30 days.  The
form instructed consumers to provide their names and identifying
information, and to "tell us what you disagree with on your
credit report."  The form supplied possible reasons why a
consumer might dispute information on his or her credit report,
including "This is not my account," "I have never paid late,"
and "I have paid this account in full."  The plaintiff never
sent in one of these forms, despite disputing the information on
his credit report several times.  Def.'s Br. Ex. A.


        B.  <u>The Origin of the Letters Sent to the Plaintiff</u>

        Prior to 2002, the defendant had a policy of not
responding to third party requests on behalf of consumers, but
it did respond to reinvestigation requests submitted by CROs.
In May of 2002, it adopted a policy to reject the disputes from
CROs, according to the defendant's Rule 30(b)(6) witness, Eileen
Little.  Little Dep. at 53.[5]  The defendant called this the 345
letter policy, after the letters it sent in response to the
disputes.  The defendant based this policy on the volume of
disputes it received from CROs (approximately 25% of all

_____

        [5]    A copy of Ms. Little's deposition is attached to the
defendant's brief as Exhibit E and cited herein as "Little Dep.
at __."

disputes, according to Ms. Little), complaints from consumers about CRO abuses, and the knowledge that NCER was under federal investigation.  Id. at 53-54.[6]

In June of 2002, after the defendant began sending the 345 letters, NCER shifted from sending the disputes itself to sending pre-drafted disputes to its clients with a cover letter instructing them to review, sign, and send the disputes to the CRA.  The plaintiff's disputes were sent in this manner.  The defendant says that it can detect NCER's involvement in these cases because the consumers often include the cover letter in the package they mail to the CRA, as the plaintiff did in June of 2003 and February of 2004.  Def.'s Br. Ex. B-1, B-3.

The defendant suspended the 345 letter policy in June of 2002, after NCER shifted its approach.  According to Ms. Little, the defendant wanted to review the policy to make sure it could tell whether disputes were coming from NCER or being sent directly from the consumer.  Little Dep. at 59.

---

[6]    In 2003, the Federal Trade Commission brought a civil action against NCER and its principals alleging that NCER challenged all negative entries on a credit report without providing any supporting documentation, and often without consulting with the consumer.  NCER entered into a consent decree that prohibited it from making any untrue or misleading statements and from advising consumers to make untrue or misleading statements, and required it to pay the FTC more than $1 million.  NCER's principals were indicted on fraud charges in September of 2004 in the Eastern District of Michigan.  Def.'s Br. Ex. F; Ex. G; Ex. H.

The defendant reinstated the policy in April of 2003.
According to Ms. Little, the defendant employed investigators to
determine whether a 345 letter should be sent in response to a
dispute.  Id. at 108.  Because disputes were frequently mailed
en masse by CROs, they often bore certain hallmarks.  The
defendant's investigators therefore examined each dispute's
postage, envelope, and return address to determine whether it
was sent by a CRO.  Id. at 70-71.  The investigators also
considered whether disputes were sent in identical formats (such
as NCER's signature "boxed-in" format) and whether the
consumer's letter was a successive dispute of all of the
derogatory information in his or her credit file.  Id. at 72-73.

Ms. Little reported that if there was ever a doubt
about whether or not the dispute came from a CRO or other third
party, the policy was to reinvestigate.  On those occasions, the
defendant would reinvestigate the dispute and send the consumer
a 341 letter that informed the consumer about his or her rights
with regard to credit clinics.  Id. at 72, 106-07.

The 345 letter policy lasted until May of 2004, when it
was suspended.  From May of 2004 until the present, the
defendant reports that it has complied with requests for
reinvestigation submitted by credit clinics.  Id. at 66.

8

II.  <u>Analysis</u>

A.  <u>Motion for Summary Judgment</u>

The FCRA confers on a consumer a right to have the
negative information on his or her credit report investigated
for accuracy, providing:

> If the completeness or accuracy of any
> item of information contained in a
> consumer's file at a consumer reporting
> agency is disputed by the consumer and
> the consumer notifies the agency
> directly of such dispute, the agency
> shall reinvestigate free of charge and
> record the current status of the
> disputed information, or delete the
> item from the file . . . before the end
> of the 30-day period beginning on the
> date on which the agency receives
> notice of the dispute from the
> consumer.

15 U.S.C. § 1681i(a)(1)(A).  When a CRA receives a dispute in
conformity with (a)(1)(A), it must provide notice of the dispute
to the entity that provided the disputed information.  <u>Id.</u> §
1681(a)(2).

A CRA need not reinvestigate every dispute, however.
An agency can terminate a reinvestigation if it "reasonably
determines that the dispute by the consumer is frivolous or
irrelevant."  <u>Id.</u> 1681i(a)(3)(A).  If an agency terminates the
reinvestigation, it must inform the consumer of the reasons for
the decision.  <u>Id.</u> § 1681i(a)(3)(B), (C).

The plaintiff claims that the defendant failed to
reinvestigate as required by section 1681i(a)(1)(A); failed to

9

notify the provider of the disputed information as required by (a)(2); and failed to give reasons for the determination of frivolousness or irrelevance as required by (a)(3)(C).[7]  The plaintiff argues that these violations were willful and thus sues under section 1681n, which authorizes a plaintiff to seek actual damages or statutory damages, in addition to punitive damages, for willful violations of the FCRA.

To prevail on a section 1681i claim, the plaintiff must prove that the disputes were "by" him and that he notified the defendant "directly" of the disputes.  The defendant argues that the plaintiff cannot establish this element, because he played no role in formulating the disputes, did not check them for accuracy, and never read them before signing the disputes and sending them to the defendant.  The defendant says that the disputes were "by" NCER, not the plaintiff, and that his only role was to serve as a mail drop.  Def.'s Br. at 3, Ex. B; Klotz Dep. at 26:15-78:5, 82:7-85:3.

The plaintiff argues that the FCRA, as a remedial statute, should be construed broadly to favor the consumer and

_____

[7]    The plaintiff's amended complaint also alleged a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection law.  The plaintiff voluntarily dismissed that claim in September of 2006.  See Stipulation of Dismissal of Count II, Docket No. 57.

10

points out that the FCRA does not forbid consumers from using credit counselors to assist them in disputes with CRAs.[8]

The plaintiff is correct that the statute does not forbid consumers from seeking assistance with credit report problems.  But critical to the obligation imposed on the CRA to investigate is that the information in the credit report be disputed by the consumer who is in a position to know whether the information is correct.

Under the plain text of section 1681i(a)(1)(A), a CRA has no obligation to reinvestigate unless an item is disputed "by the consumer," and the consumer "notifies the agency directly of the dispute."  The plaintiff's testimony makes it clear that he had nothing to do with the disputes as drafted: he just "signed and sent" them, without paying attention to the content or checking them for accuracy.  The plaintiff's disputes were drafted by NCER and he "just went with what they sent." Klotz Dep. at 166, 171.  The plaintiff's lack of involvement in

---

[8]     The plaintiff points to <u>Milbauer v. TRW, Inc.</u>, 707 F. Supp. 92, 95 (E.D.N.Y. 1989) for support of his claim.  In <u>Milbauer</u>, the court found that a CRA could not refuse to answer a dispute just because it was communicated by a third party (an attorney).   The <u>Milbauer</u> court was careful to emphasize that under the facts of the case (in which a consumer had complained about inaccurate items on his credit report to his attorney, who then referred the dispute to the agency), it would be unfair for the agency to ignore the request.  In <u>Milbauer</u>, the consumer was assisted by a third party; in this case, the third party formulated the disputes itself and the consumer's only role was to sign the dispute, and, without checking it over, send it to the CRA.

the disputes is also illustrated by the fact that the 2003 disputes claimed that most of the items on the credit report were paid in full before they went to collection, while the 2004 dispute claimed that nine of those same items related to accounts that were not his.  Def.'s Br. Ex. B.  The Court concludes that the disputes were not "by" the plaintiff, as required by the FCRA.

The Court's conclusion is reinforced by guidelines promulgated by the Federal Trade Commission ("FTC").  The FCRA charges the FTC with the statute's enforcement and authorizes the agency to issue procedural rules to assure compliance with its provisions.  The FTC's guidelines are not formal regulations and are therefore not entitled to <u>Chevron</u> deference, but they are persuasive authority.  <u>Madison v. Resources for Human Dev.</u>, 233 F.3d 175, 186 (3d Cir. 2000) (citing <u>Christensen v. Harris County</u>, 323 U.S. 134 (1944)).  The United States Supreme Court refers to FTC interpretations of the FCRA as "authoritative guidance" in <u>Safeco Ins. Co. of Am. v. Burr</u>, 127 S. Ct. 2201, 2216 (2007).

The FTC guidelines include the agency's interpretation of 1681i and "directly":  "[An agency] is not required to respond to a dispute of information that the consumer merely conveys to others (e.g., to a source of information)."  16

C.F.R. Pt. 600, Sec. 611 ¶ 7.[9]  The commentary further provides
that a CRA "need not reinvestigate a dispute about a consumer's
file raised by any third party, because the obligation under the
section arises only when 'an item of information in his file is
disputed by the consumer.'"  Id. ¶ 8.

        The FTC guidelines echo a 1987 opinion letter by the
FTC's FCRA Program Advisor, Clarke Brinckerhoff, which says that
section 1681i(a)(1)(A) does not require an agency to
reinvestigate a dispute submitted by a third party on behalf of
a consumer.  According to the letter, the plain text of the
statute requires that the consumer notify the agency directly,
and it is common sense that a consumer is in the best position
to send disputes because he or she has direct knowledge of the
items on the credit report.

        It was the prior practice of NCER to itself send the
requests for investigation to the CRA.  NCER appears to have
shifted its business methods in order to avoid the FTC's
guidelines on third-party submissions.  It provided the plaintiff
with filled-out forms rather than sending the disputes to CRAs
itself.  The plaintiff, however, cannot avoid the impact of the
statute and the FTC guidelines through this change in
formalities.  The items on his credit report were not "disputed
by" the plaintiff.  He did not decide what was to be disputed,

_____

        [9]      Hereafter, "FTC Guidelines."

the basis for the dispute, or review the disputes before signing them.  Therefore, Trans Union did not owe the plaintiff a duty to reinvestigate his disputes and the plaintiff's claim under 1681i(a)(1)(A) fails.

The Court emphasizes that this is a fact-specific decision.  The plaintiff in this case had virtually nothing to do with the disputes that he sent in, but another person could use a CRO to find problems with her credit report, review the documents and check them for accuracy, make any necessary changes, and send them to a CRA.  That person would meet the threshold requirement for a 1681i claim if the CRA refused to reinvestigate the disputed information, because the disputes were "by" the consumer, who then sent them "directly" to the CRA.  In this case, however, the plaintiff's involvement in the disputes was too negligible for him to establish this threshold requirement for a 1681i claim.

B.  Motion for Relief under Rule 56(f)

The plaintiff has moved that the Court deny the defendant's summary judgment motion to allow additional discovery under Fed. R. Civ. P. 56(f).  The plaintiff argues that because only class discovery has taken place, certain material facts are known exclusively by the defendant and are not accessible to the plaintiff.  None of the information the plaintiff seeks would

14

preclude summary judgment.  The Court is granting summary judgment on the ground that the plaintiff cannot make out a prima facie case, not on the other grounds of the motion to which the requested discovery relates.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARTIN V. KLOTZ,                    :    CIVIL ACTION
on behalf of himself and           :
others similarly situated          :
                                   :
                    v.             :
                                   :
TRANS UNION, LLC, et al.           :    NO. 05-4580

**FILED**

~~ 1 6 2008

MICHAEL E. KUNZ, Clerk

By_____Dep. Clerk

ORDER

AND NOW, this 16th day of July, 2008, upon
consideration of the defendant's motion for summary judgment
(Docket No. 89) and all briefs in support and opposition, and the
plaintiff's motion for relief under Fed. R. Civ. P. 56(f) (Docket
No. 94) and all briefs in support and opposition, IT IS HEREBY
ORDERED that for the reasons stated in the accompanying
memorandum:

        1.   The defendant's motion for summary judgment is
GRANTED.

        2.   The plaintiff's 56(f) motion is DENIED.


        Judgment is granted to the defendant and against the
plaintiff.  This case is closed.


                         BY THE COURT:


                         _____
                         Mary A. McLaughlin, J.